**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**KENYA L. WHITE,**

                    Plaintiff,

     v.                                    **Case No. 14-cv-1122-pp**

**CITY OF RACINE,**
**ART HOWELL, and**
**OFFICER TREDO,**

                    Defendants.

---

**DECISION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 34)**

---

The plaintiff, who is representing himself, filed this lawsuit under 42 U.S.C. §1983, alleging that his constitutional rights were violated. Specifically, the plaintiff claims that: (1) defendant Officer Tredo violated his rights when Tredo used excessive force while taking the plaintiff into custody, and (2) Racine Police Chief Art Howell and the City of Racine ("Racine") have a custom, policy or practice of failing to adequately train, supervise, or discipline Racine police officers with regard to their use of force. On April 15, 2016, the defendants filed a motion for summary judgment. Dkt. No. 34. For the reasons discussed in this decision, the court grants their motion as to Chief Howell and the City of Racine, but denies their motion as to Officer Tredo.

1

## I.  FACTS[1]

### A.  Parties

The plaintiff currently is incarcerated at the Oshkosh Correctional Institution; he was not incarcerated at the time of the events alleged in his complaint. Dkt. No. 36, ¶1. Howell is the Chief of Police for the Racine Police Department. Id. at ¶2. Tredo is a police officer with the Racine Police Department. Id. at ¶3. Racine is a municipal corporation located in Wisconsin; it operates the Racine Police Department. Id. at ¶4.

### B.  The Defendants' Account of March 11, 2009

On March 11, 2009, around 10:30 p.m., Racine police officers Joshua Laforge and Lina Edwardson (not defendants) responded to a call about shots being fired. Id. at ¶7. As they were driving, Laforge saw the plaintiff walking on the side of the street. Id. at ¶8.

According to the officers, they followed the plaintiff for about three blocks before they tried to stop him. Id. at ¶10. Laforge states that he rolled down his window and said, "Excuse me," and asked the plaintiff to stop. Id. at ¶11. According to Laforge, the plaintiff looked at him, then continued walking. Id. at ¶13.

---

[1] The court takes the facts from the "Defendants' Proposed Findings of Fact in Support of Defendants' Motion for Summary Judgment." Dkt. No. 36. Pursuant to this district's local rules, those facts are to be accepted as true for purposes of this decision because the plaintiff failed to respond to them. See Civil Local Rule 56(a)(1)(A) (E.D. Wis.). However, because the plaintiff is representing himself, the court will also take facts from the plaintiff's sworn complaint (Dkt. No. 1-1) because the Seventh Circuit has instructed district courts to construe a sworn complaint as an affidavit at the summary judgment stage. Ford v. Wilson, 90 F.3d 245, 246-47 (7th Cir. 1996).

Laforge stepped out of the marked police car and told the plaintiff to stop. Id. at ¶14. He states that he intended to ask the plaintiff whether he had heard the gunshots. Id. Laforge states that when he stepped toward the plaintiff, the plaintiff side-stepped away from him, which Laforge found to be suspicious. Id. at ¶15. As the plaintiff was turning away from him, Laforge saw a silver object in the plaintiff's left hand, and believed the plaintiff was awkwardly walking sideways away from him in an effort to conceal whatever was in his hand. Id. at ¶16. This concerned Laforge, who believed the plaintiff could be concealing a gun. Id.

Laforge states that he shouted at the plaintiff to stop and show him his hands, or put them on a fence, several times, but the plaintiff did not stop. Id. at ¶18, 19. The plaintiff said, "Man, you on some boo-shit" and started to run away. Id. at ¶22. Laforge states that he shouted at the plaintiff to stop, but that the plaintiff ignored him and continued to run. Id. at ¶23.

Edwardson followed the plaintiff and called out a description of him on the radio. Id. at ¶25. Tredo, who also had responded to the shots-fired call and was in the area, heard Laforge report that the plaintiff was running from him. Id. at ¶30. Tredo pulled his squad up to the area, and saw Laforge chasing the plaintiff directly toward Tredo. Id. at ¶31-32. Tredo pulled his car up on the sidewalk in front of the plaintiff, got out of his car, drew his firearm, aimed it at the plaintiff and ordered, "Police, get on the ground!" Id. at ¶¶34-36. According to Tredo, the plaintiff charged him at full speed. Id. at ¶38.

3

Tredo noted that the plaintiff did not have a weapon in his hand, but indicates that by the time he realized it, he didn't have time to re-holster his gun before the plaintiff reached him. Id. at ¶¶39-40. With his gun still in his hand, Tredo tried to wrap his arms around the plaintiff's head and pull him to the ground. Id. at ¶42. Tredo states that as he swung his arm around, his handgun hit the plaintiff in the head. Id. at ¶43. The plaintiff ducked around Tredo and continued to run, with Tredo and Laforge giving chase. Id. at ¶¶44, 46.

Tredo states that the plaintiff then threw something in the gutter; Tredo caught up to the plaintiff shortly after, and grabbed his left arm and the back of his jacket. Id. at ¶¶47-49. Tredo states that he began to fall to the ground, and that he pulled the plaintiff down with him. Id. at ¶49. Tredo tried to stabilize the plaintiff—who was prone on the ground—and get his right hand behind the plaintiff's back, but the plaintiff was actively trying to hold his hands under his chest. Id. at ¶¶51, 53. Laforge indicated that he grabbed the plaintiff's arm to try to handcuff him, but that the plaintiff was rolling around to prevent that. Id. at ¶54. So LaForge used his Taser to try to gain control of the plaintiff; the Taser "made contact" with the back of the plaintiff's right thigh. Id. at ¶55. LaForge was able to secure the plaintiff's right hand, but he had to use his Taser a second time before the plaintiff would surrender his left arm. Id. at ¶56.

Edwardson then searched the plaintiff and found bags of what she believed was marijuana, as well as a small digital scale. Id. at ¶60-62. As she

4

was searching the plaintiff, Tredo saw blood on the ground, and could see that the plaintiff was bleeding from a laceration above his left eye; Tredo stated that the injury occurred when Tredo's gun had hit the plaintiff in the face. Id. at ¶65. Tredo called for a rescue squad. Id. at ¶66. Another officer applied pressure to the wound, id. at ¶67, and rode with the plaintiff in the rescue squad to the hospital, id. at ¶72. While at the emergency room, the plaintiff received stitches; a CT Scan revealed a fractured nose, although the emergency room staff could not say whether the fracture was pre-existing. Id. at ¶76.

After being treated for his injuries, the plaintiff was transported to the Racine County Jail. Id. at ¶77. The plaintiff eventually was arrested for possession of THC with intent to deliver, possession of drug paraphernalia, and resisting/obstructing. Id. at ¶86-89.

During the criminal proceedings that followed his arrest, the plaintiff challenged his arrest and the seizure of his property on the basis that the seizure was illegal. Id. at ¶90. This attempt was unsuccessful: the plaintiff was convicted of possession and obstruction. Id. at ¶91.

C.     The Plaintiff's Account of March 11, 2009

The plaintiff's account of the March 11, 2009 encounter differs in significant ways. The plaintiff states that he was walking to his girlfriend's house, talking to her on his cell phone, when a squad car pulled up and stopped beside him. Dkt. No. 1-1, ¶¶8, 12-13. The plaintiff pulled off his hoodie and asked the officers how he could help them. Id. at ¶15. According to the plaintiff, the officers just stared blankly at him and did not respond. Id. at ¶16.

5

The plaintiff, who was unnerved by the lack of response, states that he again started walking to his girlfriend's house. Id. at ¶¶17-18. The police officers followed in their car. Id. at ¶18. After about two and one-half blocks, the officers turned the squad in front of the plaintiff, and an officer got out of the squad car with his weapon drawn and ordered the plaintiff to show his hands and place them on a nearby fence. Id. at ¶¶19-20. The plaintiff, who says he was scared, ran "for his safety." Id. at ¶20.

Shortly thereafter, Tredo pulled up and blocked the sidewalk with his car, got out with his firearm drawn, pointed the firearm at the plaintiff, and yelled, "Freeze, stop, police." Id. at ¶24. The plaintiff states that he was running so fast, and was so scared, that he couldn't stop running. Id. at ¶25. The plaintiff indicates that as he approached Tredo, Tredo tried to put the plaintiff in a headlock, but the plaintiff ducked under Tredo's arm. Id. at ¶26. The plaintiff says that Tredo realized the plaintiff was about to get away, so "in anger" he swung his firearm at the plaintiff and hit him in the face. Id. The plaintiff states that Tredo then tackled him to the ground and started punching and hitting him, while yelling, "Stop resisting." Id. at ¶27.

The plaintiff states that another officer (not a defendant) tased him twice for no reason Id. at ¶28. The plaintiff told the officer that he had high blood pressure, that he was not resisting, and that he couldn't breathe. Id. The officer replied, "So what, nigger, you shouldn't have ran." Id.The plaintiff then lay in the street, bleeding from the wound in his forehead caused when Tredo hit him with the gun. Id. at ¶29.

6

The plaintiff was transported to the hospital via ambulance. Id. at ¶30. He states he suffered, among other injuries, a fractured nose and a laceration on his forehead that required fourteen stitches. Id. at ¶35.

D.    The Plaintiff's Claims against Howell and Racine

The plaintiff argues in his response to the defendants' motion for summary judgment that Racine has policies and customs of inadequate training, supervision and discipline of its officers. Dkt. No. 43 at 4. He argues that there have been "many incidents" aside from his own "where citizens have been assaulted and excessive force has been used by [Racine police officers.]" Id. The plaintiff briefly references an incident involving "Officer Rich," during which Rich allegedly assaulted Balaal Birmingham; an incident where Racine police officers "assaulted and body slammed" Corey Cottingham while he was handcuffed; and four other pending lawsuits against the Racine Police Department involving claims of excessive force (he provides no other details such as the party names or the case numbers). Id.

The defendants point out that the plaintiff admitted under oath at his deposition that he has no knowledge about the training Racine police officers receive. Dkt. No. 36 at ¶92. He also admitted he had no evidence to support his contention that Racine has been long aware that its supervision, training, and discipline of police officers is inadequate, nor could he identify a particular policy or practice that gave rise to the "misconduct" the plaintiff complains about. Id. at ¶96, 98. The plaintiff also could not identify any officers who

7

Racine had failed to discipline, other than those involved in his arrest. Id. at ¶99.

Howell, who has worked for the Racine Police Department since 1984, states that he has personal knowledge of the police department's policies (including those in effect in 2009). Id. at ¶100, 101. He denies ever failing to properly train, supervise, discipline, or control any Racine police officers, and he clarifies that Racine does not maintain any policy, custom, or practice of failing to train, supervise, discipline, or control its police officers. Id. at ¶102, 103. He explains that Wisconsin state law governs the training of officers, including regulations governing police officer training standards in areas such as defense and arrest tactics, effecting an arrest, weapon retention, and accidental shooting. Id. at ¶109, 111.

## II.    DISCUSSION

### A.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B. <u>The Court Will Analyze the Plaintiff's Claims of Unlawful Arrest and Excessive Force under the Fourth Amendment.</u>

In its May 26, 2015 screening order (Dkt. No. 8), the court allowed the plaintiff "to proceed with his Fourth, Fifth and Fourteenth Amendment claims." Dkt. No. 8 at 5. The court erred in allowing the plaintiff to proceed under either the Fifth or the Fourteenth Amendments.

The plaintiff claims, in part: 1) that his seizure was unlawful, and 2) that Tredo used excessive force during the course of his arrest. The plaintiff has brought these claims against state, as opposed to federal, actors. The Fifth Amendment's due process clause does prohibit deprivation of liberty without due process. But it applies only to *federal* actors. <u>See, e.g.</u>, <u>Dusenbery v. U.S.</u>, 534 U.S. 161, 167 (2002) ("The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth

Amendment prohibits the States, from depriving any person of property without 'due process of law.'") Because the plaintiff has brought his claims against state actors, the Fifth Amendment due process clause does not apply.

The Fourteenth Amendment's due process clause prohibits states from depriving someone of liberty without due process. There was a time when the Supreme Court had held that the Fourteenth Amendment due process clause did not require state courts to exclude evidence obtained in violation of the Fourth Amendment. See Wolf v. Colorado, 338 U.S. 25 (1949). But in 1960, the Court held that "evidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures under the Fourth Amendment is inadmissible over the defendant's timely objection in a federal criminal trial." Elkins v. U.S., 364 U.S. 206, 1447 (1960). The Court confirmed in Mapp v. Ohio, 367 U.S. 643, 655 (1961) that the "Fourth Amendment's right of privacy has been declared enforceable against the States through the Due Process Clause of the Fourteenth." See also, New Jersey v. T.L.O., 469 U.S. 325, 334 ("the Fourth Amendment applies to the States through the Fourteenth Amendment"). Courts, including the Supreme Court, since have concluded that excessive force claims should be analyzed under the Fourth Amendment, and not under the Fourteenth. See Graham v. Connor, 490 U.S 386, 394 (1989) ("Where . . . the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment . . . ."); Lester v. City of

Chicago, 830 F.2d 706, 712 (7th Cir. 1987) (holding that ". . . the Fourth Amendment, not substantive due process, provides the proper analysis in excessive force in arrest claims. This is especially so, given that the Fourth Amendment, unlike the Fourteenth Amendment, is specifically directed to unreasonable seizures.")

The court will, therefore, analyze the plaintiff's claims under the Fourth Amendment. The Fourth Amendment guarantees people the right to be secure against "unreasonable searches and seizures."

          1.    The Plaintiff's Illegal Seizure Claim

The Supreme Court has held that the "Fourth Amendment's protection against 'unreasonable . . . seizures' includes seizure of the person." California v. Hodari D., 499 U.S. 621, 624 (1991). It is not a "seizure" for a police officer to yell to someone to stop while that person is fleeing. Id. at 1550-1551. Rather, a person has been "seized" for Fourth Amendment purposes "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Id. at 627-28 (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980).

In both his complaint and the response to the motion for summary judgment, the plaintiff focused the majority of his arguments on his claims that the defendants subjected him to excessive force and that Racine and Howell had policies, practices and customs of failing to discipline and train officers. He spared little discussion of his unlawful seizure claims. In his complaint, he asserted that "[t]he defendant officers unlawfully seized and detained plaintiff

without unlawful justification . . . ." Dkt. No. 1-1 at 7, ¶52. In his response to the summary judgment motion, he argued that the defendants "unlawfully seiz[ed] him." Dkt. No. 43 at 4.

a.    Estoppel Argument

In their summary judgment motion, the defendants argued that the plaintiff was estopped from raising the question of whether the officers' stop of him was lawful, because in state court, "[the plaintiff] and his attorneys attempted to have his arrest and/or the seizure of his property kicked out of court because [the plaintiff's] seizure was illegal or unlawful." Dkt. No. 35 at 10. They asserted that "[t]his attempt was unsuccessful because [the plaintiff] was eventually convicted of possession and obstruction." <u>Id.</u> They argue that the plaintiff's criminal conviction means that "the issue of whether the stop was constitutional was decided," that the plaintiff cannot challenge its validity, and that this court must give "prior state court judgments 'the same full faith and credit' that the judgment would receive in state court." <u>Id.</u> (Citations omitted.) They rely on the doctrine of issue preclusion, and cite <u>Freeman v. United Coal Mining Co. v. Office of Workers' Com. Program</u>, 20 F.3d 289, 293-94 (7th Cir. 1994).

The court has no idea how the plaintiff may have raised the illegal stop issue in state court. Did he file a motion to suppress, or a motion to dismiss? Did he litigate that motion in a hearing? Did the state court judge issue a ruling? The defendants do not even reference the on-line state court records available at wcca.wicourts.gov. The only evidence the defendants have provided

with regard to what the plaintiff might have argued in state court is a copy of their deposition of him in this litigation. During that deposition, which took place on March 2, 2016—seven years after the events that gave rise to this suit—counsel for the defendants asked the plaintiff the following questions, and the plaintiff gave the following answers:

> Q: During your criminal proceedings regarding your arrest from that night, did you or your attorneys ever attempt to have your arrest or the seizure of the property kicked out of court because your seizure was illegal or unlawful?
>
> A: Um, it's been a while, but I think we did.
>
> Q: And the result of it would have been that that didn't work because eventually you were convicted of those crimes, right?
>
> A: Yeah, I went to jury trial. So, yeah, we did.
>
> Q: Okay, so the jury found you guilty of, was it possession with intent?
>
> A: No, they just found me guilty of possession.
>
> Q: Okay. And what was the other one?
>
> A: Obstructing.

Dkt. No. 41-1 at 43-44.

This evidence is not sufficient to support their claim of issue preclusion. In order to benefit from the doctrine of issue preclusion (or collateral estoppel), the defendants must show that

> (1) the issue sought to be precluded must be the same as that involved in the prior action; (2) the issue must have been actually litigated; (3) the determination of the issue must have been essential to the final judgment; and (4) the

party against whom estoppel is involved must be fully represented in the prior action.

Freeman United Coal Min. Co., 20 F.3d at 293-94.

The defendants have not demonstrated that the issue the plaintiff raises here—to the extent he articulated it—is the same as the issue the plaintiff raised in his criminal case (if he even raised the issue in his criminal case—in the exchange above, the plaintiff—who is *pro se* and has no legal training—did not seem sure that he had). They have not demonstrated that even if the plaintiff raised the issue in state court, he fully litigated it. Filing a motion (if the plaintiff *did* file a motion in state court) is not "litigating"—the court must hear and resolve the motion. Presumably resolution of a motion challenging a stop would be essential to a final criminal judgment, but the defendants also fail to demonstrate whether the plaintiff was "fully represented." They assumed as much when they asked him if "he or his attorneys" had raised the issue, and the plaintiff responded in with the plural "we." But that is not sufficient to invoke issue preclusion.

b. Genuine Dispute of Material Fact

The question the court must resolve on summary judgment is whether the plaintiff has presented sufficient evidence to raise a genuine dispute of material fact regarding whether Tredo's role in the stop[2] violated the Fourth Amendment. Viewing the facts in the light most favorable to the plaintiff (the non-movant), the court concludes that by the time Tredo and the plaintiff came

---

[2] Laforge and Edwardson, the officers who initially followed the plaintiff and ordered him to stop, are not defendants, so the legality of their conduct is not at issue.

into contact, a reasonable person in the plaintiff's situation would not have believed that he was free to leave. Tredo made physical contact with the plaintiff and brought him to the ground, then grappled with him in an attempt to handcuff him. "(W)henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person, and the Fourth Amendment requires that the seizure be 'reasonable.'" United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975) (quoting Terry v. Ohio, 392 U.S. 1, 16 (1968)).

Was Tredo's stop—seizure—of the plaintiff reasonable? Police officers are justified in conducting an investigative stop if they are able to point to "specific and articulable facts sufficient to give rise to a reasonable suspicion that an individual has committed or is committing a crime." United States v. Adebayo, 985 F.2d 1333, 1339 (7th Cir. 1993). Tredo was in the area, responding to the shots-fired call, when he heard Laorge report over the radio that the plaintiff was running from Laforge. Tredo then saw Larforge chasing the plaintiff. The Supreme Court and the Seventh Circuit have held that "[f]light from a law enforcement officer gives that officer reasonable suspicion to pursue a suspect and conduct a Terry stop." United States v. Lawshea, 461 F.3d 857, 859 (7th Cir. 2006) (citing Illinois v. Wardlow, 528 U.S. 119, 123-26 (2000)). The fact of the plaintiff's flight, and Tredo's observation of it, gave Tredo reasonable suspicion to stop the plaintiff. He attempted to do so by pulling his squad car onto the sidewalk in front of the plaintiff, drawing his firearm, and ordered the plaintiff to get on the ground. The plaintiff did not comply. The plaintiff's failure

to stop when Tredo ordered him to was a basis for Tredo to increase his suspicion. Id. at 860 (citing United States v. Lenoir, 318 F.3d 725, 729 (7th Cir. 2003)). Finally, the plaintiff himself stated in his complaint that the events of that March day took place in a "high crime, drug infested area," dkt. no. 1-1 at 3, ¶20. This, too, was a basis for Tredo to increase his suspicion. Id. (citing Wardlow, 528 U.S. at 124).

The plaintiff's "[h]eadlong flight," the "consummate act of evasion," id. (citing Wardlow, 528 U.S. at 124), coupled with his failure to stop when Tredo ordered him to and the fact that the plaintiff was fleeing in a high-crime area, provided Tredo with more than enough reasonable suspicion to seize the plaintiff. Those facts are undisputed. The court will grant summary judgment in favor of the defendants on the plaintiff's unlawful seizure claim.

That, though, is not the end of the analysis. Next, the court will consider whether the plaintiff has raised a genuine dispute of material fact as to whether Tredo used excessive force in stopping and seizing the plaintiff.

    2.    <u>The Plaintiff's Excessive Force Claim</u>

        a.    Applicable Law

In the context of an arrest, "[i]n order to establish an excessive force claim under §1983, plaintiffs must demonstrate that a state actor's use of force was 'objectively unreasonable' under the circumstances." Thomas v. City of Chicago, 472 F.3d 444, 454 (7th Cir. 2006) (citations omitted). In evaluating what is "reasonable," the court looks at: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officer or

others; (3) whether the suspect was actively resisting arrest; and (4) whether the suspect was attempting to evade arrest by flight. Id.

"An officer's use of force is 'unreasonable' from a constitutional point of view only if, 'judging from the totality of circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest.'" Gonzalez v. City of Elgin, 578 F.3d 526, 539 (7th Cir. 2009) (quoting Lester v. City of Chicago, 830 F.2d 706, 713 (7th Cir. 1987)). Courts judge the reasonableness of a particular use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Weinmann v. McClone, 787 F.3d 444, 448-49 (7th Cir. 2015) (quoting Plumhoff v. Rickard, 134 S. Ct. 2012, 2020 (2014)). To that end, the court must allow for the fact that police officers are often forced to make split-second judgments about the amount of force that is necessary in circumstances that are "tense, uncertain, and rapidly evolving." Id. (quoting Plumhoff, 134 S. Ct. at 2020).

### b. Attempts to Draw in Non-Defendant Parties

In the plaintiff's original complaint the plaintiff sued the City of Racine, Art Howell, Judge Charles Constantine, Officer Tredo, Officer Rasmussen, and "Unknown Uniformed Officers." Dkt. No. 1. In its screening order, the court allowed the plaintiff to proceed on claims against all of those defendants except for Judge Charles Constantine, whom the court dismissed as a defendant. Dkt. No. 8. On June 15, 2015, the court received from the plaintiff a "motion to supplement." Dkt. No. 9. At the end of that motion, he "volunteer[ed] to dismiss

'unknown uniformed officers' as defendants." Id. Two days later, the court acknowledged the plaintiff's decision to voluntarily dismiss the "Unknown Uniformed Officers," and those defendants were dismissed without court order. Dkt. No. 10. On November 15, 2015, the court approved the parties' stipulation that the plaintiff's claims against defendant Robert Rasmussen "shall be dismissed with prejudice . . . ." and the court dismissed Rasmussen as a defendant. Dkt. No. 25.

Thus, the only remaining defendants in this lawsuit are Tredo, Howell and the City of Racine. Yet in his brief in response to the defendants' motion for summary judgment, the plaintiff claims that he felt that Edwardson and Laforge "harassed" and "entrapped" him, dkt. no. 43 at 2; that "officers" failed to intervene to help him, id. at 3; and that "defendants" unlawfully seized him, assaulted him and used excessive force, id. at 4.

Laforge and Edwardson are *not* defendants, and the plaintiff cannot amend his complaint to add them as defendants simply by including arguments in his brief in opposition to a motion for summary judgment. See Anderson v. Donahoe, 699 F.3d 989, 997 (7th Cir. 2012). While the court initially allowed the plaintiff to proceed on claims against "Unknown Uniformed Officers," the plaintiff did not ever move to substitute the proper names of those defendants nor did he file an amended complaint naming those defendants. Instead, he chose to dismiss the unidentified defendants, which means he cannot now try to bring claims against them through his response to the motion for summary judgment.

Further, the Seventh Circuit repeatedly has explained that under §1983, an individual can be liable only if that individual is personally responsible for a constitutional deprivation. See <u>Doyle v. Camelot Care Centers, Inc.</u>, 305 F.3d 603, 614-15 (7th Cir. 2002). This means that Tredo, the only officer involved in the plaintiff's arrest who is named as a defendant, is responsible only for *his* actions; he is not responsible for the actions of any other officers, including Laforge and Edwardson. Accordingly, the court will analyze only whether the plaintiff has created a genuine dispute of material fact as to whether *Tredo* used excessive force in stopping and seizing the plaintiff. The court will not address the arguments the plaintiff raises in his response brief regarding the conduct of Laforge, Edwardson or "other officers."

      c.   <u>Tredo</u>

The parties agree that Tredo pulled his car onto the sidewalk in front of the plaintiff, pulled his weapon, and ordered the plaintiff to stop. The parties also agree that the plaintiff ran full speed at Tredo, did not stop when ordered to, and tried to evade Tredo's grasp. Finally, both parties agree that Tredo's gun came into contact with the plaintiff's face and that that both the plaintiff and Tredo ended up on the ground.

The parties disagree on *how* Tredo's gun came into contact with the plaintiff's face, and *how* the plaintiff and Tredo ended up on the ground. The plaintiff says that, frustrated that the plaintiff was about to get away, Tredo hit the plaintiff in the face with his firearm; Tredo says he was just trying to wrap his arms around the plaintiff to stop him, and because he still had his gun in

his hand, *accidentally* hit the plaintiff in the head in the process. The plaintiff says that Tredo "tackled" him to the ground, then started punching and hitting the plaintiff; Tredo says that because the plaintiff was coming at him at a full sprint when Tredo was able to wrap his arms around the plaintiff, he lost his balance and fell, pulling the plaintiff down with him. Tredo indicates that while the plaintiff was on the ground, Tredo "attempted to stabilize him" in order to cuff him. Dkt. No. 38 at 3. The parties, therefore, dispute several facts relating to how Tredo stopped the plaintiff.

A factual dispute is not necessarily enough to allow a plaintiff to survive summary judgment; the dispute must relate to *material* facts. The court must determine whether, considering the facts in the light most favorable to the plaintiff (which it must do at the summary judgment stage, because the plaintiff is the non-moving party), a reasonable jury could conclude that Tredo used force that was greater than necessary under the totality of the circumstances.

What was the totality of the circumstances that Tredo faced? The plaintiff was fleeing from officers, a serious offense, and another officer had said that he suspected the plaintiff might have a weapon. Tredo states, however, that he could see that the plaintiff had no weapon in his hand, and implies that, if he had had adequate time, he would have holstered his weapon before engaging with the plaintiff. Tredo concedes that he did not believe at the time he encountered the plaintiff that Tredo or others were in danger or needed to be kept safe. He directed his efforts only at keeping the plaintiff from getting away.

The Supreme Court has held that,

> Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are a little slower afoot does not always justify killing the suspect.

Tennessee v. Garner, 471 U.S. 1, 11 (1985). Although the plaintiff was trying to evade arrest, Tredo's acknowledgment that he did not believe at the time that the plaintiff posed any threat to him or others limits the amount of force that he could use to keep the plaintiff from getting away. In other words, using deadly force was not an available option to Tredo.

The Seventh Circuit has held that a blow to the head with a closed fist or with an object can constitute deadly force. See Sallenger v. Oakes, 473 F.3d 731, 740 (7th Cir. 2007). Therefore, viewing the facts in the light most favorable to the plaintiff, the court finds that, in these circumstances, a jury could conclude that Tredo made a choice to strike the plaintiff in the head with his firearm, and that this was an unreasonable use of force under the circumstances.

In addition, while it was reasonable for Tredo to grab the plaintiff and tackle him to the ground to keep him from escaping, a jury might conclude that it was *not* reasonable for him to punch and hit the plaintiff once Tredo had him on the ground and under his control. See Frazell v. Flanigan, 102 F.3d 877, 885 (7th Cir. 1996) ("[I]t is one thing to use force in subduing a potentially dangerous or violent suspect, and quite another to proceed to gratuitously beat him. . . . The fact that a certain degree of force may have been justified earlier

in the encounter to restrain [the plaintiff] does not mean that such force still was justified once [he] had been restrained."), overruled on other grounds by McNair v. Coffey, 279 F.3d 463 (7th Cir. 2002).

The court concludes that genuine disputes of material fact exist regarding whether Tredo violated the Fourth Amendment in the course of arresting the plaintiff.

C. Tredo Is Not Entitled to Qualified Immunity.

The defendants argued in their motion for summary judgment, however, that Tredo was entitled to qualified immunity for his actions. The court does not agree.

"The affirmative defense of qualified immunity protects government officers from liability for actions taken in the course of their official duties if their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Hardaway v. Meyerhoff, 734 F.3d 740, 743 (7th Cir. 2013) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "To determine if qualified immunity applies, the courts emplos a two-prong test: (1) whether the facts, viewed in a light most favorable to the injured party, demonstrate that the conduct of the officers violated a constitutional right, and (2) whether that right was clearly established at the time the conduct occurred." Id. "The purpose of the doctrine of qualified immunity is to shield public officers from liability 'consequent upon either a change in law after they acted or enduring legal uncertainty that makes it difficult for the officer to assess the lawfulness of the act in question before he

Case 2:14-cv-01122-PP   Filed 03/15/17   Page 22 of 29   Document 48

does it.'" <u>Walker v. Benjamin</u>, 293 F.3d 1030, 1040-41 (7th Cir. 2002) (quoting <u>Ralston v. McGovern</u>, 167 F.3d 1160, 1162 (7th Cir. 1999)).

The defendants argue that Tredo is entitled to qualified immunity because "[t]he amount of force was not excessive given the degree of [the plaintiff's] resistance." Dkt. No 35 at 12. Contrary to the defendants' assertion, the court already has concluded that, viewing the facts in the light most favorable to the plaintiff, a reasonable jury could conclude that the force Tredo used to prevent the plaintiff from escaping and the force he used after the plaintiff was on the ground *was* excessive—even deadly. Because there is a genuine dispute as to whether he used excessive or deadly force, and because the law provides that officers may not use deadly force to prevent a defendant from fleeing, Tredo is not entitled to qualified immunity. The court will deny the defendants' motion for summary judgment as to the plaintiff's excessive force claim against Tredo.

D. <u>The Plaintiff's Claims against Racine and Howell</u>

Claims against a municipality are often called <u>Monell</u> claims, in reference to the U.S. Supreme Court case which allowed such claims under certain circumstances. <u>See</u> <u>Monell v. New York City Dept. of Soc. Servs.</u>, 436 U.S. 658 (1978). The purpose of a <u>Monell</u> claim is to distinguish acts of the municipality from acts of employees of the municipality; "[m]isbehaving employees are responsible for their own conduct." <u>Estate of Sims ex rel. Sims v. Cnty. of Bureau</u>, 506 F.3d 509, 514 (7th Cir. 2007).

To prove a _Monell_ claim against a municipality, a plaintiff must first establish that he has suffered a deprivation of a constitutional right. _See_ 42 U.S.C. §1983. Second, a plaintiff must establish that an official policy or custom exists. _Estate of Sims ex rel. Sims_, 506 F.3d at 514. Third, a plaintiff must establish causation by connecting the policy or custom to the constitutional deprivation and showing that the former was the "moving force" behind the latter. _Id_. Failure to establish any of the three prongs is fatal to a plaintiff's claim.

The defendants focus their argument on plaintiff's failure to satisfy the second prong: his failure to demonstrate that Racine had an official policy or custom. "In order to recover against a municipal . . . defendant under section 1983, it is no enough for the plaintiff to show that an employee of the municipality . . . violated his constitutional rights; he must show that his injury was the result of the municipality's . . . official policy or custom." _Rice ex re. Rice v. Corr. Med. Servs._, 675 F.3d 650, 675 (7th Cir. 2012) (citations omitted). The plaintiff must show that the municipality made "a deliberate choice to follow a court of action . . . from among various alternatives . . . ." _Id._ (Citations omitted.)

> An official policy or custom may be established by means of an express policy, a widespread practice which, although unwritten, is so entrenched and well-known as to carry the force of policy, or through the actions of an individual who possesses the authority to make final policy decisions on behalf of the municipality . . . . The plaintiff must also show a direct causal connection between the policy or practice and his injury, in other words that the policy or custom was the "'moving force [behind] the constitutional violation.'"

24

Id. (Citations omitted.)

The court need not explain further the express-policy and individual-action routes; those are self-explanatory. If a plaintiff attempts to establish the existence of a policy or custom with evidence of a widespread practice, a plaintiff must show that the relevant official (here, Howell) was "deliberately indifferent as to [the] known or obvious consequences" of the alleged widespread practice. Thomas v. Cook Cnty. Sheriff's Dept., 604 F.3d 293, 303 (7th Cir. 2009) (quotations omitted). A plaintiff must show that the official knew of the practice, or that it was so pervasive that he must have known. See Phelan v. Cook Cnty., 463 F.3d 773, 790 (7th Cir. 2006).

The plaintiff argues that Racine has a widespread practice or custom of failing to adequately train its officers in the appropriate use of force and/or to discipline officers who improperly use excessive force. The plaintiff also pursues a claim against Howell in his individual capacity on these same allegations. The defendants argue that the plaintiff provides no evidence to support his claim that such a widespread practice or custom exists, and therefore that Racine and Howell are entitled to summary judgment. The court agrees with the defendants.

As explained above, for these claims to survive summary judgment, the plaintiff needed to show that a genuine question of material fact exists over whether Racine and/or Howell condone or turn a blind eye to Racine police officers using excessive force. The plaintiff could have done so in one of three ways.

First, he could have provided evidence of an express (written, or stated) policy; he did not. When asked at his deposition what policies he was referring to in his complaint, the plaintiff responded, "Just talking about just basic protocol, basic training. You know, all cops got that." Dkt. No. 41-1, at 46. The plaintiff's vague references to "basic protocol" and "basic training" are insufficient to dispute Howell's statements, made under the penalty of perjury, that Racine "does not maintain a de facto policy . . . of failing to train, supervise, discipline or control [its] on or off duty police officers." Dkt. No. 36 ¶103.

Second, the plaintiff could have provided evidence of a widespread practice which, although unwritten, was so entrenched and well-known that it carried the force of policy. At his deposition, the plaintiff pointed only to his own experience as an example of Racine's and Howell's practice or custom of failing to train its officers in the use of force and/or discipline its officers for using excessive force. He would not (or could not) identify other individuals who he believed were treated similarly to him.

In his response to the defendants' motion for summary judgment, the plaintiff identified two individuals whom he claimed individual officers, or Racine officers in general, subjected to excessive force. He also referred to four lawsuits pending against Racine, involving claims of excessive force. These assertions are not sufficient. Bare statements at depositions, or in briefs, are not evidence. Not only has the plaintiff failed to produce admissible evidence to support his claims, but the few examples the plaintiff identifies are insufficient

26

as a matter of law to create a question of fact about whether a widespread practice or custom existed. See Thomas v. Cook Cnty. Sheriff's Dept., 604 F.3d 293, 303 (7th Cir. 2009). ("[T]here is no clear consensus as to how frequently [certain] conduct must occur to impose Monell liability [under the custom and practice theory], except that it must be more than one instance, or even three.")

Finally, the plaintiff could have provided evidence of specific actions of an official with policy-making authority. Assuming that the plaintiff believes Howell to be the official with policy-making authority, the plaintiff makes only broad, conclusory allegations about Howell's conduct. Howell, on the other hand, explains, under the penalty of perjury, that he has personal knowledge of the Racine Police Department policies, and asserts that at no time did he fail to properly train, supervise, discipline or control any Racine police officers. In addition, he states that Racine does not facilitate misconduct by failing to adequately punish or discipline instances of police conduct, nor does Racine encourage abuses by its police officers. The plaintiff makes no effort to dispute these statements, let alone provide admissible evidence to create a question of fact with regard to these statements.

In short, summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." Johnson v. Cambridge Indus., Inc., 325 F.3d 892, 901 (7th Cir. 2003) (quoting Schacht v. Wisconsin Dept. of Corr., 175 F.3d 497, 504 (7th Cir. 1999). The plaintiff offers no evidence to support his allegations that Howell and/or Racine failed to train or supervise Racine

police officers with regard to the use of force or failed to discipline officers who used excessive force. While his unsupported allegations were sufficient to state a claim against these defendants, they are not sufficient to survive summary judgment. The court will grant summary judgment in favor of defendants Racine and Howell on the plaintiff's <u>Monell</u> claims.

      E.    <u>The Plaintiff's State Law Claims</u>

The court's May 26, 2015 screening order did not address whether the plaintiff could proceed on his state-law claims of assault, battery and intentional infliction of emotional distress. That was the court's oversight. Even assuming, however, that the court had expressly allowed the plaintiff to proceed on those claims, they would not survive summary judgment.

In their motion for summary judgment, the defendants argue that the court must dismiss the plaintiff's state-law claims because he failed to comply with Wis. Stat. §893.80. Section 893.80(1d)(a) of the Wisconsin statutes provides that a party may not bring an "action" against a "governmental subdivision or agency," or an employee of such a subdivision or agency, unless the person gives written notice of the claim to that agency within 120 days. Failure to provide this notice will not bar the "action" if the person can show that the agency or employee had "actual notice" of the claim, and that the failure to give the notice was not prejudicial to the agency or employee. The defendants have indicated that the plaintiff did not provide that notice. Dkt. No. 36 at ¶114. The plaintiff has not disputed that assertion.

Because the plaintiff failed to provide the required notice, the court will dismiss his state law claims.

## III. CONCLUSION

The court **ORDERS** that the defendants' motion for summary judgment (Dkt. No. 34) is **GRANTED** as to defendants Art Howell and the City of Racine, and the court **DISMISSES** defendants Howell and the City of Racine.

The court **ORDERS** that the defendants' motion for summary judgment (Dkt. No. 34) is **GRANTED** as to the plaintiff's unlawful arrest/seizure claim.

The court **ORDERS** that the defendants' motion for summary judgment is **DENIED** as to the plaintiff's excessive force claim against defendant Daniel Tredo. The court will recruit counsel to represent the plaintiff on his surviving claim.

Dated in Milwaukee, Wisconsin this 15th day of March, 2017.

BY THE COURT:

HON. PAMELA PEPPER
United States District Judge